**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**IMA FINANCIAL GROUP, INC., et al.,**

**Plaintiffs,**

**v.**

**RICHARD BRYAN, et al.,**

**Defendants.**

**Case No. 6:26-cv-01119-HLT-RES**

## MEMORANDUM AND ORDER

Defendants Richard Bryan, Allyn Roberts, and Jason Homrighaus are former employees of Plaintiffs IMA Financial Group, Inc. and IMA Inc. (collectively, IMA). IMA sued Defendants after they left their jobs and began working for a competitor. The instant dispute involves a conflict between two contracts. The first contract is a confidentiality and non-solicitation agreement (NSA Agreement) that contains a forum-selection clause providing for Kansas state or federal courts. The second contract is a Shareholder Agreement that contains an arbitration provision for disputes arising by reason of Defendant's employment with IMA. IMA contends the first contract controls, and Defendants contend the second contract controls and move to compel arbitration. Doc. 5.

Kansas law follows ordinary contract law that parties may modify a written contract by a subsequent contract and that the later contract generally controls if the two contracts are in conflict. The Shareholder Agreement is the later written contract signed by both parties and its arbitration clause is broad, exclusive, and covers the asserted employment-related claims. The Shareholder Agreement thus displaces the earlier forum-selection clause. The Court grants the motion, compels arbitration, and stays this case.

## I. BACKGROUND[1]

IMA provides financial services. Doc. 1-1 at ¶ 8. Defendants are former employees of IMA. *Id.* ¶ 9. Bryan worked as a senior leader from October 2020 until September 2025, when he left to join Howden. *Id.* ¶ 10. Roberts worked as a producer from June 2021 until January 2026, when he left to join Howden. *Id.* ¶ 11. Homrighaus also worked as a producer from June 2021 until January 2026, when he left to join Howden. *Id.* ¶ 12.

Defendants all signed NSA Agreements with IMA, which had different restrictive provisions. *Id.* ¶¶ 14-19. The NSA Agreements required Defendants to agree to various confidentiality and post-employment obligations in exchange for compensation, including the option to purchase IMA stock. Doc. 6-3 at 4-5. Paragraph 14 of the NSA Agreements states that the agreements "can be terminated, changed, or supplemented only by instrument in writing, signed by both Parties," and that "[t]he provisions of this Agreement shall be in addition to those of any other agreements between the Parties, all of which are to be construed as complementary to each other and shall be cumulative in[] effect." *Id.* at 12. But the NSA Agreements also state: "If there are inconsistencies between this Agreement[] and other agreements with respect to the matters set forth herein, this Agreement shall supersede and control." *Id.* The NSA Agreements all state that any litigation between the parties, including but not limited to disputes about the subject matter or terms of the NSA Agreements, shall be litigated in state or federal court in Sedgwick County, Kansas, and that forum is the exclusive and only proper forum for such disputes. *Id.* at 13.

In exchange for signing the NSA Agreements, IMA allowed Defendants to purchase stock, which they all did pursuant to IMA's Shareholder Agreement. Doc. 6-1 at 1-2;[2] Doc. 6-2 at 1; Doc.

---

1 The following facts are taken from the complaint and the parties' briefing and are accepted as true at this stage.

2 Bryan apparently went through this process twice: he signed an NSA Agreement in 2020 and then bought stock under the Shareholder Agreement, and then he again signed a second NSA Agreement in 2022 and again bought

6-3 at 1.[3] The Shareholder Agreement states that it applies to anyone who becomes a shareholder after the execution of the agreement. Doc. 6-3 at 29. The Shareholder Agreement includes a mandatory arbitration provision. *Id.* at 27. It states that any dispute "with respect to the interpretation of this Agreement or any matter arising in connection with or by reason of Stockholder's . . . employment with IMA" is subject to mandatory and binding arbitration. *Id.* Arbitration under the Shareholder Agreement is the exclusive remedy for any dispute. *Id.* at 28. The Shareholder Agreement states that certain former agreements are null and void and superseded, but this provision only applies to "previously executed stock purchase agreements, redemption agreements, or similar agreements." *Id.* at 29. Defendants all continue to own IMA stock. Doc. 6-1 at 2; Doc. 6-2 at 1; Doc. 6-3 at 1.

Roberts also signed a promissory note on July 21, 2021, which required him to pay the outstanding balance upon termination of his employment with IMA. Doc. 1-1 at ¶ 21. The promissory note had a forum-selection clause designating the courts in Wichita, Kansas, as the exclusive body to hear disputes. *Id.*; *see also* Doc. 15-3. Roberts and Homrighaus also had compensation plans that required them to pay the difference in the draw received and the amount of compensation earned upon termination with IMA. Doc. 1-1 at ¶ 22. It's not clear if the compensation plan is contained in any of the agreements that are part of the record or is a different agreement altogether.

After Bryan left IMA to join Howden, three IMA employees from Bryan's office left to join Howden. *Id.* ¶ 23. On information and belief, IMA contends Bryan has solicited IMA clients

stock under the Shareholder Agreement in 2022. Doc. 6-1 at 1-2. This chain of events doesn't seem to meaningfully impact the analysis.

3 There's no signed Shareholder Agreement in the record, nor is it clear when anyone signed it. But the parties don't seem to dispute that Defendants acquired stock pursuant to that agreement after they signed the NSA Agreements.

to move their business to Howden. *Id.* ¶ 26. Several IMA clients previously serviced by Roberts and Homrighaus have notified IMA that Howden was their new broker. *Id.* ¶¶ 27-28. Several clients have requested their information from IMA using nearly verbatim requests, suggesting they were being coached about what information to request. *Id.* ¶ 29. Some clients have stated they had been in communication with Roberts or Homrighaus before naming Howden as their new broker. *Id.* ¶ 30. On information and belief, IMA contends Roberts and Homrighaus have solicited IMA clients to move to Howden in violation of their NSA Agreements. *Id.* ¶ 31.

At the time Roberts and Homrighaus left IMA, they had a draw deficit. *Id.* ¶ 24. Both have been notified of the amount owed but neither have paid. *Id.* Roberts also owed on the promissory note but has not paid. *Id.* ¶ 25.

IMA filed suit in state court in Sedgwick County, Kansas, alleging that Defendants breached their agreements. Defendants removed the case and now move to compel arbitration under the arbitration provision in the Shareholder Agreement.

## II. STANDARD

The Federal Arbitration Act states that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

A court analyzes two issues before compelling arbitration: (1) whether an agreement to arbitrate exists, and (2) whether the allegations in the complaint are within the scope of the agreement. *See Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018). The framework for deciding whether an agreement to arbitrate exists is like summary judgment. *See*

*Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014). The moving party bears the initial burden of showing the existence of an agreement to arbitrate. *Id.* If shown, the burden shifts to the non-moving party to raise a genuine dispute of fact about the existence of an agreement. *Id.*

If there is a factual dispute whether the parties made an agreement to arbitrate, a trial may be needed. *Id*. But "[w]hen parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate." *Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016).

## III. ANALYSIS

It is undisputed that the parties entered into at least two agreements.[4] First, Defendants signed the NSA Agreements, which puts all disputes in court. Second, after the parties signed the NSA Agreements, they became parties to the Shareholder Agreement, which puts disputes about Defendants' employment with IMA in arbitration. The parties do not seem to dispute that the claims in this case would fall within the Shareholder Agreement's arbitration clause should that agreement's arbitration clause control. Thus, the issue the Court must decide is whether the arbitration clause in the Shareholder Agreement controls over the forum-selection clause in the NSA Agreements.

The Supreme Court has explained that which contract controls is a question for a court to decide. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024) ("Here, then, before either the delegation

---

[4] IMA asserts a breach of contract claim against Roberts based on a promissory note and against Roberts and Homrighaus for repayment of unearned commissions. The promissory note is governed by Kansas law and has a forum-selection clause designating courts in Wichita, Kansas (like the NSA Agreements). Doc. 15-3 at 2. Other than the fact that Roberts signed the promissory note on July 21, 2021, there is nothing in the record about the timing of the execution of the Shareholder Agreement compared to the execution of the promissory note. It's unclear what the unearned-commissions claim is based on. Neither party meaningfully argues that the promissory note or any other agreement impacts the analysis. All parties focus on the priority of the NSA Agreement versus the Shareholder Agreement. The Court therefore focuses on these two contracts, both of which all Defendants signed.

provision or the forum selection clause can be enforced, a court needs to decide what the parties have agreed to—i.e., which contract controls."). "[W]hether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate." *Ragab*, 841 F.3d at 1137. State-law principles control whether the parties agreed to arbitrate. *Id.* The NSA Agreements and the Shareholder Agreement are governed by Kansas law. Doc. 6-3 at 13, 29. The Court therefore relies on Kansas law to determine whether the parties agreed to arbitrate, i.e., whether the Shareholder Agreement controls over the NSA Agreements in terms of dispute resolution.

The analysis here is straightforward. Kansas law states that "a written contract may be varied, modified, waived, annulled, or wholly set aside by any subsequent executed contract." *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 777 (10th Cir. 2010) (internal quotation and citation omitted). "If two successive contracts are in conflict, the later supersedes the earlier one." *Id.* Here, the Shareholder Agreement is a later written agreement signed by both parties. Its arbitration clause is broad and exclusive and covers "any dispute" that arises "in connection with or by reason of [Defendant's] . . . employment with IMA . . . ." Doc. 6-3 at 27. The asserted claims are employment-related disputes that arise by reason of each Defendant's employment with IMA. This arbitration provision modifies or displaces the forum-selection clause in the NSA Agreements and controls.

IMA resists this outcome and relies heavily on a clause in the NSA Agreements that states: "If there are inconsistencies between this Agreement[] and other agreements with respect to the matters set forth herein, this Agreement shall supersede and control." *Id.* at 12. IMA contends that this provision overrides <u>all</u> conflicting agreements, including future agreements. But there are two problems with this argument.

First, it reflects an unreasonably broad reading of the clause because it ignores other language in the NSA Agreements (which expressly recognizes the ability to modify the contract). The paragraph IMA relies on states:

> **14. Entire Agreement and Severability**
>
> This Agreement constitutes the full and complete understanding and agreement of the Parties as to the matters it purports to cover, and supersedes any prior understanding and oral agreements. HOWEVER, if this Agreement is found to be without adequate consideration, or otherwise unenforceable, the Parties agree that the confidential, nondisclosure, and non-solicitation agreement in place immediately before this Agreement was signed, if such an agreement exists, should govern the Parties relationship. This Agreement can be terminated, changed, or supplemented only by instrument in writing, signed by both Parties. This Agreement specifically may not be amended, modified or supplemented by any oral communication. If any provision of this Agreement should be invalid or unenforceable, such invalidity orunenforceability shall not affect the remaining provisions hereof, and this Agreement shall be construed and enforced in all respects as if such invalid provisions were omitted. Without limiting the generality of the foregoing, if the covenants of paragraphs 5 or 9 shall be deemed to create a restriction which is unreasonable as to duration, geographic area or otherwise as to scope, the Parties agree to petition the court to enforce the provisions of paragraphs 5 or 9 as to a reasonable duration, geographic area or scope. The provisions of this Agreement shall be in addition to those of any other agreements between the Parties, all of which are to be construed as complementary to each other and shall be cumulative ineffect. Nothing herein shall prevent EMPLOYER from enforcing any and all other agreements or other documents in accordance with their respective terms. If there are inconsistencies between this Agreementand other agreements with respect to the matters set forth herein, this Agreement shall supersede and control. Nothing in this agreement shall be construed to narrow or limit EMPLOYEE's fiduciary duties

*Id.* This paragraph does contain the language upon which IMA relies. But a few sentences earlier it also expressly recognizes that "[t]his Agreement can be terminated, changed, or supplemented only by instrument in writing, signed by both Parties." *Id.* The Shareholder Agreement is an instrument in writing, signed by each Defendant and IMA, that changes the dispute-resolution process. The Shareholder Agreement thus <u>satisfies</u> the plain language of the NSA Agreement for changes or supplements. Reading the clause upon which IMA relies in the manner IMA contends renders this sentence superfluous and nonsensical (e.g., the parties can't terminate, change, or supplement the NSA Agreement because the NSA Agreement supersedes and controls any future inconsistencies). A more logical and consistent reading is that the clause upon which IMA relies

focuses on prior agreements between the parties, not subsequent ones. This reading is consistent with the dictionary definition of "supersede"[5] and with the contract as a whole.[6]

Second, and relatedly, the outcome IMA advocates for ignores the general principle that parties to a contract have the freedom to use subsequent contracts to adjust contractual bargains they have already struck. Kansas courts have long recognized this freedom:

> It is well settled, that the terms of a written contract cannot be varied by any previously executed contract, written or parol, nor by any contemporaneous parol contract. It is equally well settled, that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside, by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.

*Todd v. Allen*, 1877 WL 1097, at *2 (Kan. 1877). And other courts have echoed it:

> What is excluded by one act is restored by another. You may put it out by the door; it is back through the window. Whenever two men contract, no limitation self-imposed can destroy their power to contract again.

*Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 381 (N.Y. 1919) (Cardozo, J.), *supersession by state statute recognized by Israel v. Chabra*, 906 N.E.2d 374, 378-79 (N.Y. 2009). Parties in Kansas have the power to modify their contracts with each other even if they agreed at an earlier time that they could not. Here, in contracts written by IMA, the parties modified the earlier contract. And IMA has not pointed to a state (or federal) statute that would limit their ability to do so under these circumstances.

---

[5] *See, e.g.*, Black's Law Dictionary (12th ed. 2024) ("To annul, make void, or repeal by taking the place of[.]"); https://www.merriam-webster.com/dictionary/supersede ("[T]o take the place or position of[,]" with example referencing previous edition.); https://www.oed.com/dictionary/supersede_v?tab=meaning_and_use#19689955 ("To make of no effect; to render void, nugatory, or useless; to annul; to override; to take precedence over.").

[6] The NSA Agreement states that it "supersedes any prior understanding and oral agreements." Doc. 6-3 at 12 (emphasis added). If IMA is correct, then this sentence is also superfluous because the NSA Agreement controls all other agreements—past, present, and future.

In sum, the parties executed the NSA Agreements, which had a forum-selection clause that favored a court resolving disputes. They subsequently executed the Shareholder Agreement, which states that any employment-related disputes will be resolved in arbitration. Under Kansas law, the subsequent Shareholder Agreement modified and superseded the parties' agreement about where certain disputes will be resolved and changed that forum from court to arbitration. This modification was in accordance with the terms of the NSA Agreements allowing for the same. But even if it had not been consistent with the terms of the NSA Agreement, the later in time agreement would still control the result. Under Kansas law, parties are not shackled to contractual obligations they both rethink and later contract to change. Obligations created by earlier agreements do not control over conflicting obligations found in later agreements. Because it is undisputed that the claims in this case relate to Defendants' employment with IMA, this dispute belongs in arbitration under the terms of the Shareholder Agreement.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion to Compel Arbitration (Doc. 5) is GRANTED. The Court compels arbitration and stays this case.

THE COURT FURTHER ORDERS Defendants shall file a status report in six months or within fourteen days of the conclusion of arbitration, whichever is earlier.

IT IS SO ORDERED.

Dated: October 15, 2026

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE